# YetterColeman LLP

October 13, 2015

The Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY  10007-1312

RE:   SPV OSUS Ltd. v. UBS AG *et al.*, No. 15-cv-00619 (JSR)

Dear Judge Rakoff:

At the October 6, 2015 hearing on the Access Defendants' motion to dismiss, the Court requested that we submit a description of specific allegations addressing proximate causation with respect to the loss suffered by Optimal Strategic US Equity Ltd. ("OSUS"), assignor to plaintiff SPV OSUS Ltd. ("SPV"), that SPV would plead if granted leave to amend its complaint.  By this letter we submit the requested description in the form of an overall chronology, following a brief introduction.

The gravamen of SPV's allegations is that, by their conduct that substantially assisted Bernard Madoff and/or Bernard L. Madoff Investment Securities, LLC ("BLMIS") to commit fraud, breach of fiduciary duty, and conversion, and because the conduct constituted knowing participation in a breach of trust by Madoff and/or BLMIS, the Access Defendants proximately caused the loss of money that OSUS invested and held in BLMIS over a continuous period from 1997 to December 2008.  More specifically, the Access Defendants were complicit in Madoff's strategy to target international investors, including OSUS and its shareholders, to expand and perpetuate the BLMIS Ponzi scheme by inducing such investors to deposit money with BLMIS and to remain invested in BLMIS until it was too late to redeem their investments.  A critical, but not exclusive, facet of the substantial assistance by the Access Defendants involved helping Madoff to conceal the fraud by, among other things, concealing what they knew of the fraud from both the world at large and international investors in particular and promulgating misleading marketing materials that affirmatively misrepresented BLMIS's true nature over the course of many years.

We begin by noting that "[s]ubstantial assistance exists 'where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'"  *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476, 883 N.Y.S.2d 486 (2009) (quoting *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003)).  "[S]ubstantial assistance can take many forms," among them participation in atypical financial transactions and "even ordinary course transactions . . . where there is an extraordinary motivation to aid the fraud." *JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 257 (S.D.N.Y. 2005)   Additionally, losses can be proximately caused by conduct that induces investors to retain their investments in fraudulent schemes.  See *Hotaling v. A.B. Leach & Co.*, 247 NY 84, 93 [1928]; *Stern Bros, v*

YetterColeman LLP

The Honorable Jed S. Rakoff                -2-                    October 13, 2015

*New York Edison Co.*, 251 App. Div. 379,381 [1st Dept. 1937]; *Continental Ins. Co. v Mercadante*, 222 App. Div. 181 [1st Dept. 1927]).  In the particular context of the Madoff fraud, culpable parties may have "caused [investors] to suffer a loss by inducing them to retain their investments" past certain dates because "[b]y the very nature of Madoff's scheme, [investors] were less and less likely to be able to redeem the longer they retained their investments." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 445 (S.D.N.Y. 2010).

SPV is prepared to plead allegations giving rise to the strong inference that the Access Defendants affirmatively assisted, helped conceal, and by virtue of failing to act when required to do so enabled the fraud and other torts by Madoff and/or BLMIS to proceed.  Such conduct proximately caused loss by inducing OSUS to make and retain investments in BLMIS over a period of years, up until the collapse of BLMIS in December 2008.  Those allegations include the following:

### Littaye's relationship with Madoff and the early days of the Madoff fraud

- The Access Defendants' complicity with the Madoff fraud stems initially from defendant Patrick Littaye's personal relationship with Madoff, which dates back to 1985.

- From 1985 until 1992, Littaye was Managing Director for brokerage activities at Banque Pallas France.

- In the early days of the Madoff fraud, 1992 was a critical year.  Although Madoff had fraudulently managed individual accounts before 1992, in that year the SEC closed down some of Madoff's feeder funds for not being registered to sell securities.  One of the funds, Avellino & Bienes ("A&B"), was the successor to Madoff's father-in-law's feeder fund.  A judge appointed a receiver to handle A&Bs affairs, and the receiver demanded that Madoff return A&B's money and produce records of all trades.  Madoff delivered, in part by fabricating records.  Madoff learned from the A&B debacle.  By the early 1990s, he had to administer hundreds of accounts, too many to generate phony trade confirmations and account statements on an account-by-account basis.  He realized that he needed a new investment strategy that could credibly explain how he could consistently achieve his target rates of return across so many accounts.  This is when Madoff began stating that he would be managing client accounts using the "split strike conversion" strategy.  Replacing numerous individual investors with large feeder fund accounts would reduce the complexity involved in generating fraudulent account statements and trade confirmations.

YetterColeman LLP

The Honorable Jed S. Rakoff                -3-                        October 13, 2015

### Founding of Access in 1995

- In 1995, Littaye and Rene-Thierry Magnon de la Villehuchet founded Access International Advisors ("AIA"). As was widely reported at the time, Defendant Villehuchet committed suicide on December 22, 2008, shortly after the Madoff fraud was revealed.

- Although allegedly distinct and separately organized in their various jurisdictions, AIA LLC, AIA Europe Ltd., AIA Ltd., AP (Suisse), Access Mgmt Lux, and AP (Lux) (collectively, "Access") were, in reality, merely alter-egos of each other. At all times relevant, these Access entities were dominated and controlled by Littaye and Villehuchet, who marketed and used their network of Access entities as a collective whole to service their many BLMIS portals, which included Luxalpha and Groupement Financier, among other BLMIS-feeder funds.

- Originally a distributor of other entities' hedge fund products, Access later evolved into a manager and portfolio advisor for its own hedge funds and investment products, with offices in New York, the Bahamas, London, and throughout Europe. Access served as the center of a network of funds that provided the point of entry to Madoff for billions of dollars from European investors.

- After initially serving as a marketer and distributor of hedge funds managed by other companies, Access, under the leadership of Littaye and Villehuchet, became what is described in its own marketing materials as a manager of "a platform of US hedge funds specializing in absolute return investment strategies by providing a centralized approach to due diligence, operations, distribution, compliance and most importantly, risk management."

- Access owned and operated a series of what it termed "single manager hedge fund products, each with its own investment mandate." Access's marketing materials also stated that while Access served as the portfolio manager and risk manager for all of its funds, "Access hires a Trading Advisor to provide specialized investment advice to each fund," and that all such Trading Advisors were located in the United States and invested predominantly in U.S. assets.

- Access promoted itself as a link between its predominantly European clients—consisting of high net worth individuals, family offices, funds of funds, private banks and asset management companies—and "seasoned US managers with proven track records."

YetterColeman LLP

The Honorable Jed S. Rakoff                    -4-                         October 13, 2015

- By no later than AIA's founding in 1995, Littaye and/or other Access Defendants began their activities directed at inducing European investors to deposit money in BLMIS.

**OSUS is created and begins investing in BLMIS in 1997. Access's Madoff-related activities in Europe continue.**

- In 1997, SPV's assignor OSUS was created, controlled, and managed by subsidiaries of Banco Santander, S.A. ("Santander"), a European bank.

- Santander subsidiary Optimal Investment Services, S.A. ("OIS") served as the investment manager of OSUS. OIS is incorporated in Switzerland. Its principal offices are located in Geneva, Switzerland, and it has additional offices in New York, Miami, and Madrid.

- OSUS's shareholders were international, primarily European.

- As reflected in explanatory memoranda issued by OIS on behalf of OSUS, Madoff and/or BLMIS made false statements misrepresenting what BLMIS would do with money OSUS invested in BLMIS. For example, OSUS was informed by Madoff and/or BLMIS that

  > The strategy utilized by the Broker-Dealer [*i.e.*, BLMIS] is called 'split-strike conversion' and entails: (i) purchasing a basket of thirty (30) to forty (40) large capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general marked; . . . .

  In fact, no stocks would be purchased with OSUS's deposited money because BLMIS was merely a Ponzi scheme.

- On January 28, 1997, OSUS opened its BLMIS account with a $3 million deposit. Throughout 1997, OSUS made additional deposits totaling over $352 million into BLMIS: $4.8 million on March 3, 1997; $225,000 on March 31, 1997; $25.589 million on April 30, 1997; $1.2 million on May 1, 1997; over $18.5 million on May 19, 1997; $11.49 million on July 1, 1997; $1 million on July 14, 1997; $3 million on July 31, 1997; $8.5 million on August 15, 1997; $21.971 million on September 3, 1997; over $10.6 million on October 1, 1997; $18.2 million on November 4, 1997; and $2.484 million on December 1, 1997.

- In addition to Luxalpha and Groupement Financier, Littaye's relationship with Madoff gave rise to additional feeder funds and individual accounts as well. Feeder funds Trotanoy Investment Company Ltd. ("Trotanoy") and Citrus Investment Holdings Ltd. were set up through the Access

**YetterColeman LLP**

The Honorable Jed S. Rakoff -5- October 13, 2015

- entities and together funneled over $200 million into BLMIS. Littaye was also responsible for the creation of at least eight other individual managed accounts at BLMIS which, combined, contributed tens of millions more to Madoff's scheme.

- On a monthly basis, from the time OSUS's account was opened in 1997 through November 2008, BLMIS issued customer statements to OSUS that constituted misrepresentations. Among the misrepresentations in each customer statement issued to OSUS were false statements that OSUS's money was invested in equity holdings and reports of a net asset value that included fictitious "gains." There were, in fact, no investments in equities and no actual gains because BLMIS was a Ponzi scheme in which customers' money was not actually invested and customers who redeemed all or part of their investments were paid with new money flowing into the scheme.

- Each time OSUS received a customer statement falsely reporting information such as fictitious gains and decided to increase or retain its investment in BLMIS, OSUS was acting in reasonable reliance on the misrepresentations in the customer statement.

- Relying on misrepresentations such as those contained in the monthly customer statements and given that third parties such as the Access Defendants who knew of the fraud assisted Madoff and BLMIS in concealing it, OSUS was induced to increase and retain its investment in BLMIS over a number of years.

**Madoff pushes to increase European investment. Access-created feeder funds begin directing hundreds of millions of dollars from the European market to BLMIS. OSUS retains and increases its investment.**

- By the late 1990s and into the early 2000s, Madoff embarked on a strategy to attract additional European investment into the BLMIS Ponzi scheme, which would provide the infusions of cash needed to perpetuate and expand the fraud.

- In 1998, Madoff's sons Mark and Andrew Madoff became directors of Madoff Securities International Ltd. ("MSIL"), the Madoff-affiliated company in London. In the early 2000s, Madoff increased MSIL staffing to include 12 traders as Madoff began to attract European investors into his Ponzi scheme. In 2000 and 2001, Madoff allegedly personally loaned $62.5 million in order to increase the size of MSIL's operations so that it could play a more active role in the Ponzi scheme.

YetterColeman LLP

The Honorable Jed S. Rakoff -6- October 13, 2015

- Coinciding with the beginning of Madoff's increased push for European investment, the Access-created fund Trotanoy opened its BLMIS account and began investing in BLMIS at least by July 1998.

- Between 1998 and early 2003, OSUS continued to retain and increase its investment in BLMIS. Over that time period, OSUS deposited an additional amount exceeding $530 million into BLMIS.

- Also coinciding with Madoff's strategy of increasing investment from Europe was the decision to create and structure the BLMIS-feeder funds Luxalpha and Groupement Financier ("Groupement"). Those entities would prove to be extremely helpful to Madoff's strategy of perpetuating the Ponzi scheme through an influx of European cash as they became the conduit for billions of dollars of European investment into BLMIS.

- Beginning at least by April 2003, Groupement was investing in BLMIS. On April 8, 2003, Groupement invested over $3.8 million into BLMIS. Between May 1, 2003, and August 8, 2003, Groupement additionally deposited over $12.9 million into BLMIS, for a total of more than $16.7 million by early August 2003.

- On August 29, 2003, OSUS deposited an additional $15 million into BLMIS.

- Between September 3, 2003, and January 16, 2004, Groupement directed over $54.6 million in additional funds into BLMIS.

- On January 30, 2004, OSUS increased its investment in BLMIS by an additional $50 million.

- In 2004, Access raised assets for investment in eleven different families of funds, 50% of which were directed to BLMIS. As of 2005, 52% of assets placed through Access were invested at BLMIS, accounting for 61% of Access's total net revenue.

- Beginning by March 2004 at the latest, Luxalpha was depositing European investment money into BLMIS, giving the Ponzi scheme the additional infusions it needed. On March 22, 2004, Luxalpha deposited over $146 million into BLMIS. On March 23, 2004, Luxalpha deposited over $101 million into BLMIS. On March 24, 2004, Luxalpha deposited $35 million into BLMIS. On March 26, 2004, Luxalpha deposited over $60 million into BLMIS, for a grand total of over $342 million funneled into the Madoff Ponzi scheme in March 2004 alone.

**YetterColeman LLP**

The Honorable Jed S. Rakoff                    -7-                    October 13, 2015

- Groupement also continued to direct money into BLMIS, depositing an additional $28.02 million into BLMIS in February 2004.

- On March 31, 2004, OSUS increased its investment in BLMIS with an additional $20 million deposit.

- Between April 16, 2004, and September 15, 2004, Luxalpha directed over $199 million into BLMIS.

- Between May 10, 2004, and July 8, 2004, Groupement directed an additional $30.6 million into BLMIS.

- On September 30, 2004, OSUS increased its investment in BLMIS with an additional $25 million deposit.

**OSUS continues to retain and increase its investment in BLMIS, while Access funds continue to direct money into BLMIS.**

- In 2005, Luxalpha directed over $93.35 million into BLMIS.

- In 2006, Luxalpha directed an additional nearly $351 million into BLMIS.

- Throughout 2005 and into 2006, OSUS retained and increased its investment in BLMIS, making $592 million in deposits into BLMIS between the beginning of 2005 and May 31, 2006.

- In 2007, Luxalpha's deposits into BLMIS began to slow, but it deposited an additional nearly $60 million into BLMIS.

- In 2007, OSUS deposited an additional $145 million into BLMIS, and retained its BLMIS account which, by the close of 2007, reflected a net balance of over $1.4 billion in cash deposits.

**In 2008, Access feeder funds first pump nearly half a billion dollars into BLMIS, then begin frantically withdrawing money ahead of BLMIS's collapse, while OSUS remains invested in BLMIS until the end.**

- In 2008, Luxalpha's contributions into BLMIS took a sharp uptick beginning in February, and between February 2, 2008 and July 18, 2008, Luxalpha directed an additional nearly $325 million into BLMIS.

- Luxalpha then did an about face and began withdrawing its cash from BLMIS in large amounts, including but not limited to: a $130 million withdrawal on September 11, 2008, a $180 million withdrawal on October 10, 2008, another $180 withdrawal on October 24, 2008, a $50 million

**YetterColeman LLP**

The Honorable Jed S. Rakoff -8- October 13, 2015

- withdrawal on November 14, 2008, and a $125 million withdrawal on November 19, 2008, scarcely three weeks before BLMIS collapsed.

- Groupement's deposits and withdrawals followed a similar pattern in 2008. Between January 8, 2008, and August 27, 2008, Groupement pumped $119.8 million into BLMIS. It then began making large withdrawals, including but not limited to a $155 million withdrawal on September 24, 2008, and a $65 million withdrawal on November 14, 2008.

- On April 30, 2008, OSUS deposited an additional $60 million into BLMIS. On August 22, 2008, OSUS deposited an additional $99.5 million into BLMIS.

- During the fall of 2008, while Luxalpha and Groupement were pulling their money from what they must have known was Madoff's sinking ship, OSUS retained almost its entire investment on deposit with BLMIS. After its last cash deposit of $99.5 million on August 28, 2008, OSUS made only one withdrawal, on October 31, 2008, in the amount of $150 million, a small fraction of the $1.6 billion net cash OSUS had deposited with BLMIS, let alone the approximately $2.9 billion stated value of OSUS's BLMIS account.

**Additional Access activities during the time period OSUS was investing in BLMIS**

- During the time periods described above, Access Defendants were conducting marketing activities relating to investment in BLMIS and directed to the European marketplace. OSUS's parent and its investment manager OIS were headquartered and operated in Europe, and many OSUS shareholders were also part of the European market to which Access's marketing activities were directed.

- For example, AIA LLC served as Luxalpha's portfolio advisor from August 1, 2004, to November 17, 2008, charged with primary responsibility for marketing and monitoring Luxalpha's investments through BLMIS.

- The Access Defendants exploited the close relationship between Madoff and Littaye to create, market, and sell Luxalpha and Groupement Financier, both of which served to provide BLMIS with the large infusions of money from European investors. Access misrepresented the controls, oversight, and protections in place for those feeder funds, and ultimately endorsed BLMIS without performing the due diligence that was promised.

YetterColeman LLP

The Honorable Jed S. Rakoff -9- October 13, 2015

- For example, in a July 20, 2007 marketing presentation, Access misrepresented that its investments including BLMIS were all subject to stringent due diligence, claiming:

    > Access's aim is to deliver a **highly reliable product** to investors. Through its process (due diligence, operations, distribution, compliance, risk management) Access reduces the three main threats inherent to hedge funds: 1. Risk of fraud, through its **extensive due diligence process; and** 2. Risk of drift in investment management, through **ongoing monitoring and risk management (daily)** 3. Risk of dilution through **control of capital inflow.**

- Such misrepresentations were calculated to give anyone in the marketplace exposed to them the false impression that Access subjected BLMIS to such scrutiny and found it to be legitimate.

- During the time period in which OSUS was increasing and retaining its investment in BLMIS, the Access Defendants received at least $100.6 million in fees for purportedly serving Luxalpha and Groupement in various capacities. And the Access Defendants worked collaboratively with UBS to protect themselves from any inquiry that threatened to disrupt the funds and the fees both groups earned from them. The Access Defendants also knew that BLMIS, very atypically, took no fee for its money management services or any portion of the fees the feeder fund charged investors, but rather only (purported) trading commissions of 4 cents for every share traded and $1 for every option. This meant that feeder funds like Luxalpha and Groupement could keep the entirety of the lucrative management fees charged to their customers, which might be l%-2% of assets plus a performance fee of 20% of profits, for just turning the money over to Madoff. These fees were a strong financial motivation for Access to help keep the Ponzi scheme going. Further, diverting funds from BLMIS customer accounts to pay fees to third parties like Access and UBS, injured customers like OSUS by decreasing the likelihood that they can recover their losses.

- During the time period in which OSUS was increasing and retaining its investment in BLMIS, the Access Defendants were also taking additional steps to actively conceal what they knew of Madoff's fraud. For example, Littaye quashed any investigation of the "red flags" identified by Access personnel, as when he shut down the investigation by Chris Cutler, a specially-retained consultant, into irregularities in Access's BLMIS account, in late April or early May 2006.

YetterColeman LLP

The Honorable Jed S. Rakoff -10- October 13, 2015

**OSUS's losses**

- Each day during the period from when OSUS began investing in January 1997 up to, at least, December 11, 2008, OSUS could have decided to withdraw its money from BLMIS but instead decided to remain invested in BLMIS.

- The final customer statement issued by BLMIS to OSUS, dated November 30, 2008, reported $2,919,934,627.70 in net investments, purported gains, and option positions, in OSUS's account. Thus, as of December 10, 2008, OSUS could have demanded and withdrawn over $2.9 billion from BLMIS. But it could not do so after BLMIS collapsed. And that loss to SPV-assignor OSUS resulted from OSUS's being induced to make and retain its investment in BLMIS by conduct including the substantial assistance by the Access Defendants described above.

These facts support the strong inference that the Access Defendants substantially assisted Madoff and BLMIS by, among other things, affirmatively assisting Madoff with his strategy to keep the Ponzi scheme afloat by attracting European investment, helping to conceal the Madoff fraud for years, and by failing to act when required to do so. Failing to perform the due diligence that Access represented to the European marketplace it was performing is but one (albeit glaring) example. Such conduct proximately caused the harm to OSUS, which participated in the European marketplace that was particularly targeted by Access's involvement in Madoff's scheme.

For these reasons, SPV respectfully requests leave to amend its complaint to include the allegations described above.

 Respectfully submitted,

 Collin J. Cox

cc: All Counsel of Record